# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SHRIEVE CHEMICAL PRODUCTS, INC., | * * | |
| **Plaintiff** | * | CIVIL ACTION NO. _____ |
| | * | |
| **VERSUS** | * | |
| | * | |
| CAREMOLI USA, INC. | * | |
| and ANDREA CAREMOLI, | * | |
| **Defendants** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SHRIEVE CHEMICAL PRODUCTS, INC.'S COMPLAINT FOR DECLARATORY RELIEF CONCERNING MARKETING AGREEMENT, AND TO RECOVER SUMS DUE UNDER PROMISSORY NOTE, PURCHASE ORDERS, GUARANTY, AND FOR ENFORCEMENT OF SECURITY INTERESTS

NOW INTO COURT, through undersigned counsel, comes Shrieve Chemical Products, Inc., who for its Complaint for Declaratory Relief Concerning Marketing Agreement and to Recover Sums Due Under Promissory Note, Purchase Orders, Guaranty, and For Enforcement of Security Interests represents as follows:

### JURISDICTION AND VENUE

1.

Plaintiff SHRIEVE CHEMICAL PRODUCTS, INC. ("Shrieve") is a Texas corporation with its principal place of business in The Woodlands, Texas. Shrieve is, therefore, a citizen of the State of Texas.

2.

Defendant CAREMOLI USA, INC. ("C-USA"), is an Iowa corporation with its principal place of business in Ames, Iowa. C-USA is, therefore, a citizen of the State of Iowa.

3.

Defendant DR. ANDREA CAREMOLI ("Dr. Caremoli") is the President and CEO of C-USA and a guarantor of C-USA's obligations.  On information and belief, Dr. Caremoli is either a citizen of the United States domiciled in Key Biscayne, Florida, or an Italian citizen lawfully admitted for permanent residence in the United States and domiciled in Key Biscayne, Florida. Dr. Caremoli is *not* a citizen of the State of Texas.

4.

The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

5.

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

6.

Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.  28 U.S.C. § 1391.

## BACKGROUND
### The Business Proposition

7.

Guar is a legume that is principally cultivated in India. The beans of the guar plant contain a substance called guar gum, which has various industrial applications.

8.

When properly manufactured and processed, guar gum can be refined into fast hydrating guar powder, which is used as an additive in hydraulic fracturing fluids ("oilfield guar").

9.

When exposed to different manufacturing processes, guar gum can be refined to produce food-grade guar, which is used as an ingredient in industrial food production ("food-grade guar").

10.

Shrieve is a global marketer and manufacturer of oilfield chemicals and products, including oilfield guar.

11.

C-USA is a subsidiary of the Caremoli Group, an international food ingredient manufacturer and supplier.

12.

In 2013, C-USA approached Shrieve to discuss a mutually beneficial project: C-USA would build and operate a 10,000 ton per year guar gum processing plant in Houston, Texas (the "Plant") capable of producing both food-grade guar and oilfield guar.

13.

Earnest to acquire a domestic source of oilfield guar, Shrieve agreed to help C-USA in its venture.

14.

On November 18, 2013, Shrieve loaned C-USA five million ($5,000,000) dollars for the purchase of equipment for the Plant (the "Loan").

**The Loan Documents**

15.

On November 18, 2013, C-USA and Shrieve entered into a Loan Agreement.

-3-

16.

A true and correct copy of the Loan Agreement is attached hereto as Exhibit "1."

17.

The Loan Agreement provided, among other things, that (a) Shrieve would extend financing to C-USA under certain specified conditions, and (b) C-USA would grant Shrieve a security interest in certain specified collateral.

18.

 The Loan is evidenced by a promissory note executed by C-USA in favor of Shrieve dated November 18, 2013, in the principal amount of $5,000,000 and containing such terms and bearing interest as set forth therein (the "Note").

19.

A true and correct copy of the Note is attached hereto as Exhibit "2."

20.

The Note bears interest at the non-default rate of Prime Rate (defined as the "per annum interest rate established by Comerica Bank as its prime rate for its borrowers, as such rate may vary from time to time, which rate is not necessarily the lowest rate on loans made by Comerica at any such time") plus four percent (4%) per annum, and at the default rate of eighteen percent (18%) per annum.

21.

On November 18, 2013, C-USA and Shrieve entered into a Security Agreement ("Security Agreement"), pursuant to which C-USA pledged the following collateral to secure C-USA's obligations to Shrieve under the Note:

> All of Debtor's [*i.e.*, C-USA's] interest in the personal property,
> equipment and fixtures affixed or attached to, or placed or situated

> on, or used or acquired in any way whatever in connection with the operation of Debtor's business at the Locations [*i.e.,* the Plant], and all proceeds … of such property, including: inventory; general intangibles; chattel paper or instruments constituting proceeds of the inventory and in proceeds of such chattel paper and instruments; equipment; general intangibles; instruments; documents, including documents of title, warehouse receipts, and bills of lading, covering equipment and/or inventory; and fixtures.

22.

A true and correct copy of which is attached hereto as Exhibit "3."

23.

In the Security Agreement, C-USA agreed to pay all of Shrieve's expenses, including reasonable attorney's fees and legal expenses incurred to obtain, preserve, perfect, defend, and enforce the Security Agreement; to collect or enforce the collateral, and to collect or enforce the Note. *See* Security Agreement, Exhibit "3" at p. 3, ¶ B(2).

24.

The Security Agreement was perfected by the filing of two UCC-1 financing statements (collectively, the "Shrieve UCC-1s"): (i) No. 20140070909 dated February 21, 2014 and on file with the Harris County Clerk of Court, and (ii) No. P14001122-9 dated February 21, 2014 and on file with the Iowa Secretary of State.

25.

True and correct copies of the UCC-1s are attached hereto as Exhibit "4," *in globo*.

26.

On November 18, 2013, Dr. Caremoli executed a Guaranty Agreement ("Guaranty Agreement") in favor of Shrieve, pursuant to which he guaranteed

> the prompt and full payment and performance, when due, of all indebtedness and obligations, fixed or contingent, whether arising by contracts, purchase orders, notes, guaranties, discounts, overdrafts, or in any other manner,

-5-

which **Caremoli USA, Inc.** may now or at any time hereafter owe Creditor [*i.e.*, Shrieve], including, without limitation, interest and collection costs specified in any document evidencing, securing or pertaining to any such indebtedness and obligations.

*See* Guaranty Agreement, at p. 1 (bracketed text supplied, defined terms omitted).

27.

A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit "5."

28.

The guaranty provided by Dr. Caremoli is unlimited in amount, continuing in nature, unconditional, and irrevocable.  *See* Guaranty Agreement, Exhibit "5" hereto, at ¶ 1.

29.

By its terms, the Guaranty Agreement allows Shrieve to collect from Dr. Caremoli upon the default of C-USA on any indebtedness owed to Shrieve, without any requirement that Shrieve first take action against C-USA or any collateral.

30.

As guarantor, Dr. Caremoli also agreed "to pay all costs of collection, including attorney's fees and expenses" if the Guaranty Agreement "is placed in the hands of an attorney for collection or is collected through any court."  *See* Guaranty Agreement, Exhibit "5" hereto, at ¶ 13.

**The Marketing Agreement**

31.

On November 18, 2013, Shrieve and C-USA entered into a Marketing Agreement ("Marketing Agreement") whereby Shrieve agreed to market and sell at least 3,600 tons per year of oilfield guar produced by C-USA at the Plant.

-6-

32.

Due to the confidential nature of the Marketing Agreement, Shrieve will seek leave of Court to file a true and correct copy of the Marketing Agreement as Exhibit 6 **under seal** after the filing of this Complaint.

33.

Pursuant to the Marketing Agreement, Shrieve had the right and obligation to market and sell, and C-USA had the obligation to deliver, fast hydrating guar for use in oilfield operations with properties detailed in the specifications set forth in Exhibit A to the Marketing Agreement. Marketing Agreement, Exhibit "6" (**to be filed under seal**), at pp. 1, 3.

34.

According to the Marketing Agreement and the parties' expectations, the Plant was to be fully operational by the second quarter of 2014.  Marketing Agreement, Exhibit "6" (**to be filed under seal**), at p. 3, § 2 ("the Plant may not be operational until the second calendar quarter of 2014").

35.

The Marketing Agreement was to be effective between the parties from November 18, 2013, to March 31, 2021, unless terminated in accordance with the provisions of Section 15 of the Marketing Agreement. Marketing Agreement, Exhibit "6" (**to be filed under seal**), at p. 3, § 2.

36.

Section 15 of the Marketing Agreement provided that the it could be terminated by (a) mutual agreement of the parties, (b) written notice by either party given at least twelve (12) months before the date specified in such notice and payment of a termination fee of

$2,000,000.00, payable sixty days after delivery of such notice, and (c) written notice by either party based upon the other party's breach of any material covenant of failure to perform any material obligation, if such default or failure to perform is not cured within thirty days of the notice.  Marketing Agreement, Exhibit "6" (**to be filed under seal**), at §§ 15.1.2, 15.1.3, 15.1.4, 15.1.5, 15.1.6.

37.

The Marketing Agreement provides that "Shrieve shall have the right to set-off amounts owed by Shrieve to Caremoli against any amount that is due and owing from Caremoli to Shrieve under this Agreement or any other agreement between the parties."   Marketing Agreement, Exhibit "6" (**to be filed under seal**), at § 8.3.

## C-USA Fails to Comply with the Requirements of the Marketing Agreement

38.

Relying on C-USA's promises and repeated representations that the Plant would be operational by the second quarter of 2014, Shrieve prepared to fulfill its purchase obligations with oilfield guar from the Plant.

39.

For example, Shrieve entered into a three-year supply agreement with Magnablend, pursuant to which Shrieve agreed to supply and Magnablend agreed to purchase, a minimum of 3600 metric tons of oilfield guar per year produced from the Plant.

40.

C-USA and Dr. Caremoli were fully aware of the Magnablend contract, and knew that Shrieve's contract with Magnablend was essential for Shrieve to be able to enter into the Marketing Agreement and to loan C-USA the funds for the equipment purchase for the Plant.

-8-

41.

Contrary to C-USA's repeated assurances, the Plant was not operational by the second quarter of 2014.

42.

As a consequence of C-USA's failure to make the Plant operational, Shrieve defaulted on its supply contract with Magnablend, which caused Shrieve significant financial and reputational damage.

43.

Notwithstanding its failure to have the Plant operational by the second quarter of 2014, C-USA continued to assure Shrieve that the Plant would soon be operational and encouraged Shrieve to be patient.

44.

In late 2014, C-USA informed Shrieve that the Plant would be operational very shortly, and encouraged Shrieve to solicit sales of the Plant's oilfield guar and to purchase raw material for the Plant in preparation for the November 2014 opening.

45.

Relying on C-USA's assurances and advice, pursuant to Section 7 of the Marketing Agreement, Shrieve paid C-USA approximately ten million dollars ($10,000,000) to purchase approximately 5,200 metric tons of agricultural raw material—partially processed guar endosperm material, also known as "splits,"—which C-USA then purchased.

46.

Nevertheless, despite C-USA's assurances, the Plant was not operational in November of 2014.

47.

Because the Plant was not operational in November of 2014, Shrieve's 5,200 metric tons of splits, which had a limited shelf life, sat unused (until C-USA repurchased a portion of the splits by executing the Purchase Orders described in Paragraphs 67-70 below).

48.

The Plant began to operate on a limited basis in mid-2015.

49.

Upon commencing partial operations, the Plant was unable to produce material that met the quality and standards required by the Marketing Agreement and expected by the parties.

50.

Put simply, the product delivered by C-USA was not fit for its intended purpose in oilfield operations.

51.

C-USA acknowledged to Shrieve the quality problems with the Plant's guar production.

52.

Over the course of the following months, C-USA and Shrieve continued to work together to attempt to improve the quality of the product, to no avail.

53.

In August 2015, Shrieve and C-USA discussed the possibility of shifting the Plant's production to solely food-grade guar due to C-USA's inability to produce high-quality oilfield guar as required by the Marketing Agreement.

-10-

54.

Shrieve did not, in either August or September 2015, affirmatively consent to the diversion of the Plant entirely to the production of food-grade guar.

55.

In September 2015, C-USA made a unilateral decision to convert a line to food-grade production.

56.

C-USA did not follow through on its unilateral decision to convert a line to food-grade production only after Shrieve objected.

57.

Despite the problems with the product, Shrieve in good faith continued to take oilfield guar from the Plant in the fourth quarter of 2015 in an attempt to utilize it.

58.

The majority of oilfield guar taken by Shrieve in the fourth quarter of 2015 was of poor quality and remains in Shrieve's warehouse as it cannot be sold to customers.

59.

In November 2015, Dr. Caremoli admitted to one of C-USA's suppliers that the Plant had various problems and "was not producing in full."

**Plan "B"**

60.

After two years of repeated problems, delays, and disappointments, it became clear to both Shrieve and C-USA that the Plant would never be able to produce oilfield guar in the quantity or quality required by the Marketing Agreement.

61.

Thus, in December of 2015, Shrieve and C-USA agreed to shift the entire Plant to food-grade guar production.

62.

C-USA represented that it had ample business to support production of food-grade guar.

63.

Shrieve remained invested in the Plant's survival due to C-USA's outstanding indebtedness under the Note and the Purchase Orders.

64.

C-USA converted both Plant lines to produce food-grade guar in January of 2016.

65.

The consequence of this agreed-upon conversion was that the Plant could no longer produce oilfield guar, and Shrieve could no longer market or sell it.

66.

Through May 2016, C-USA never indicated that it believed Shrieve owed C-USA any amounts for termination of the Marketing Agreement.

**Additional Indebtedness Owed by C-USA to Shrieve**

67.

In the fourth quarter of 2015 and first quarter of 2016, to assist C-USA with its transition to food-grade guar, Shrieve agreed, at C-USA's request, to sell C-USA a portion of the remaining splits referenced in Paragraphs 45 and 47 on credit, with extended repayment terms.

68.

True and correct copies of the Purchase Orders and associated Shrieve invoices and debit memos are attached hereto as Exhibit "7," *in globo*.

69.

The purchase price for the splits, as set forth in the C-USA Purchase Orders, was $3,802,329.26.

70.

To further assist C-USA with its transition to food-grade guar, Shrieve agreed to accept payments for the splits from C-USA in monthly installments over a ten month period. *See* C-USA Purchase Orders included within Exhibit "7."

71.

Dr. Caremoli's guaranty of C-USA's debts to Shrieve includes the amounts due under the C-USA Purchase Orders and associated Shrieve invoices.

72.

C-USA repeatedly assured Shrieve that it would repay Shrieve in full for all outstanding indebtedness on both the Purchase Orders and the Note.

**C-USA Defaults Under the Note**

73.

In January 2016, in an effort to assist C-USA with its transition to food grade production, Shrieve agreed to forbear from enforcing C-USA's payment obligations under the Note.

74.

The forbearance period that Shrieve granted to C-USA expired on March 31, 2016.  Since that time, C-USA has not made any payments under the Note.

75.

Shrieve attempted to reach an amicable resolution of its disputes with C-USA, to no avail.

76.

Accordingly, on July 21, 2016, Shrieve notified C-USA that its failure to make the required payments on the Note constituted an event of default and that Shrieve had exercised its option under the acceleration clause, rendering the outstanding principal balance of the Note and all unpaid accrued interest to be immediately due and payable.

77.

Default interest at the rate of eighteen percent per annum continues to accrue on the outstanding indebtedness until paid in full.

78.

C-USA is also liable for all costs of collection on the Note, including without limitation, reasonable attorney's fees and disbursements, and costs of suit.

**C-USA Defaults in its Payments on the Purchase Orders**

79.

Since January 31, 2016 C-USA has failed to make the required payments on the Purchase Orders when due.

80.

Although C-USA has since used the splits to produce food-grade guar, which it has sold, C-USA has made only one $50,000 payment to Shrieve, leaving a balance owed of $3,752,329.26.

**COUNT I – Declaratory Action for Termination of Marketing Agreement**

81.

On June 24, 2016, Shrieve sent C-USA a letter explaining its position that the Marketing Agreement terminated in January 2016 by mutual agreement to convert the Plant to food-grade guar production, or alternatively, pursuant to section 15.1.6 of the Marketing Agreement for C-

-14-

USA's failure to make the Plant operational within the specified time period, by its failure to deliver conforming oilfield guar in amounts required by the Marketing Agreement, and its failure to cure said defaults.

82.

Out of an abundance of caution, and as an alternative in case a court of competent jurisdiction does not find that the Marketing Agreement terminated in January 2016, Shrieve notified C-USA in its June 24, 2016 letter that it invoked termination of the Marketing Agreement pursuant to section 15.1.4.

83.

A true and correct copy of Shrieve's June 24, 2016, letter is attached hereto as Exhibit "8."

84.

Section 15.1.4 of the Marketing Agreement provides that Shrieve is entitled to terminate the Marketing Agreement pursuant to twelve months written notice and payment of a $2,000,000.00 termination fee within sixty days after such notice.

85.

Shrieve seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure to clarify existing rights between Shrieve and C-USA, as an actual controversy exists between Shrieve and C-USA concerning the parties' rights and obligations with respect to whether the Marketing Agreement terminated in January 2016.

86.

A declaratory judgment herein will serve a useful purpose in clarifying and settling legal relations at issue.

87.

Shrieve therefore requests a declaration that:

(a)     the Marketing Agreement was terminated by mutual agreement in January 2016, when the object of the Marketing Agreement became impossible; or in the alternative,

(b)     the Marketing Agreement was terminated by C-USA's failure to make the Plant operational within the specified time period, by its failure to deliver conforming oilfield guar in amounts required by the Marketing Agreement, and its failure to cure said defaults.

88.

In the alternative, if the Court does not find that the Marketing Agreement terminated as a result of the parties' mutual agreement or C-USA's breaches in January 2016, Shrieve requests a declaration that:

(a)     That the Marketing Agreement is terminated effective June 24, 2017, pursuant to Shrieve's letter of June 24, 2016;

(b)     The stipulated fee for termination is $2,000,000.00 as provided in section 15.1.4 of the Marketing Agreement; and

(c)     If and to the extent this Court determines that Shrieve owes a $2,000,000.00 termination fee or is otherwise indebted to C-USA, Shrieve seeks a declaration consistent with Section 8.3 of the Marketing Agreement that any such amounts be set-off against C-USA's indebtedness to Shrieve pursuant to the Purchase Orders.

### COUNT II – Unpaid Balance of the Purchase Orders

89.

C-USA owes Shrieve $3,752,329.26 for the splits that C-USA purchased and used.  As of the date of filing, $3,290,092.02 is past due.  An additional $183,237.24 will become due on July 31, 2016, $90,000.00 on August 15, 2016, $90,000.00 on September 15, 2016, and $90,000.00 on October 15, 2016.

90.

Shrieve's terms and conditions provide that "Interest shall be charged on all past due amounts owed by Buyer hereunder at an interest rate equal to the lesser of (i) 5% per annum and (ii) the maximum rate permitted by law, from the payment due date until paid in full." *See* Purchase Orders, Exhibit "7."

91.

Shrieve is entitled to judgment against C-USA and Andrea Caremoli, as guarantor of C-USA's indebtedness, in the amount of $3,752,329.26 together with interest at the rate of 5% per annum from the due date of each installment payment, plus all costs of collection, including reasonable attorney's fees.

### COUNT III – Failure to Pay Amounts Due Pursuant To Promissory Note

92.

Under the terms of the Note, C-USA's default on the Note (and/or termination of the Marketing Agreement) caused the outstanding principal balance of the Note and all unpaid accrued interest to become immediately due and payable.

93.

As of July 21, 2016, the principal balance on the Loan is $3,651,409.57, with accrued interest at the Prime Rate plus 4% of $153,434.27, with interest continuing to accrue thereafter at the default rate of 18.0% *per annum*.

94.

Shrieve is entitled to judgment against C-USA and Andrea Caremoli, as guarantor of C-USA's indebtedness, in the amount of $3,651,409.57, with accrued interest as of July 21, 2016 in the amount of $153,434.27, with interest continuing to accrue thereafter at the default rate of 18.0% *per annum*.  In addition, under the terms of the Note, Shrieve is entitled to reimbursement of its reasonable attorney's fees, costs and expenses incurred in collecting the amounts due under the Note.

## COUNT IV – Recognition of Duly Perfected Security Interests

95.

Shrieve asks the Court to recognize Shrieve's duly perfected security interest in the collateral described in the Security Agreement and in the Shrieve UCC-1s.

96.

Accordingly, Shrieve is entitled to a judgment recognizing Shrieve's duly perfected security interest in the collateral described in the Security Agreement and in the Shrieve UCC-1s.

## COUNT V – Damages

97.

Shrieve is entitled to damages arising from C-USA's misrepresentations and breaches of the Marketing Agreement during its existence.

98.

These damages include the value of Shrieve's lost income due to C-USA's delays in making the Plant operational and its failure to deliver conforming oilfield guar.

99.

Shrieve is also entitled to damages for loss of goodwill and reputation suffered by Shrieve due to its inability to meet purchase orders and supply contracts that Shrieve accepted in reliance on C-USA's promises regarding the Plant's capabilities, and its association with the Plant's defective oilfield guar.

## CONCLUSION AND PRAYER

WHEREFORE, Shrieve Chemical Products, Inc. prays that, after due proceedings are had, there be:

1.    A judgment declaring that the Marketing Agreement between Shrieve Chemical Products, Inc., and Caremoli USA, Inc., terminated by mutual agreement in January 2016; or alternatively, that the Marketing Agreement terminated prior to January 2016 due to C-USA's failure to cure defaults under the Marketing Agreement.

2.    In the further alternative, a judgment declaring that Shrieve Chemical Products, Inc., invoked termination of the Marketing Agreement on June 24, 2016; that the sole recovery to which C-USA is entitled for the termination is $2,000,000.00 as set forth in the Marketing Agreement; and that any amounts due from Shrieve to C-USA be setoff against C-USA's indebtedness owed to Shrieve on the Purchase Orders.

3.     Judgment in favor of Shrieve Chemical Products, Inc., and against Caremoli USA, Inc. and Andrea Caremoli, *jointly and severally*, in the amount of $3,752,329.26 representing the balance due to Shrieve for the sale of the splits to C-USA pursuant to the Purchase Orders, with interest at the rate of 5% from the due date of each installment payment, and costs and expenses, including attorney's fees, incurred in the enforcement and collection of same.

4.     Judgment in favor of Shrieve Chemical Products, Inc., and against Caremoli USA, Inc., and Andrea Caremoli, *jointly and severally*, for the principal amount of $3,651,409.57, with accrued interest of $153,434.27 as of July 21, 2016, with interest continuing to accrue thereafter at the default rate of 18.0% *per annum*, together with attorney's fees and costs incurred in enforcing the same.

5.     Judgment recognizing the perfection and priority of Shrieve's security interest in the collateral described in the Security Agreement and the UCC-1s.

6.     Judgment in favor of Shrieve Chemical Products, Inc., and against Caremoli USA, Inc. and Andrea Caremoli, jointly and severally, for all other damages to which Shrieve is entitled.

7.     All other general and equitable relief.

Respectfully submitted,

Michael D. Rubenstein (TX # 24047514)
**LISKOW & LEWIS**
1001 Fannin Street, Suite 1800
Houston, TX 77002
Telephone:  (713) 651-2953
Facsimile:  (713) 651-2952
mdrubenstein@liskow.com

*Attorneys for Shrieve Chemical Products, Inc.*

-20-

Of Counsel:

Jillian M. Marullo (TX # 24080504)
**LISKOW & LEWIS**
1001 Fannin Street, Suite 1800
Houston, TX 77002
Telephone:  (713) 651-2900
Facsimile:  (713) 651-2908
jmmarullo@liskow.com